UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GE TRANSPORTATION PARTS, LLC,

       Plaintiff and Counterclaim Defendant,

   –v–

CENTRAL RAILWAY MANUFACTURING, LLC,

       Defendant and Counterclaim Plaintiff.

Case 1:19-cv-04826-AJN

## AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS OF CENTRAL RAILWAY MANUFACTURING, LLC

Defendant and Counterclaim Plaintiff Central Railway Manufacturing, LLC ("CRM"), by and through its counsel, submits this answer and defenses to the Complaint (Dkt. No. 1) filed on May 23, 2019 by Plaintiff and Counterclaim Defendant GE Transportation Parts, LLC ("GE"), and counterclaims against GE.

## ANSWER

In response to the specific allegations contained in the Complaint, CRM states as follows:

1.      CRM admits the allegations in paragraph 1 of the Complaint and respectfully refers the Court to the November 16, 2015 Supply Agreement ("Supply Agreement") attached to the Complaint for a full and complete statement of the terms pursuant to which CRM manufactured and sold to GE the GE Event Recorder ("GEER"). Dkt. No. 1-2 (unredacted version sealed, *see* Dkt. No. 8). CRM lacks a sufficient factual basis to admit or deny the allegations contained in footnote 1, and so denies those allegations.

2.      CRM avers that paragraph 2 of the Complaint sets forth legal conclusions to which no response is required, but to the extent a response is required, CRM denies the characterizations about its actions or omissions.

3.      Paragraph 3 of the Complaint sets forth legal conclusions to which no response is required; CRM avers that the cited regulations speak for themselves.

4.      CRM admits the allegation in the first sentence of paragraph 4 of the Complaint that GE purchased GEERs from CRM to resell to GE railroad customers. CRM otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4, except to acknowledge that one railroad customer was located in the United States (the "U.S. Customer") and one was located in Canada (the "Canadian Customer").

5.      Paragraph 5 of the Complaint contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus CRM understands no response to be required. To the extent a response is required, CRM avers that the cited portions of the Supply Agreement speak for themselves; otherwise, CRM denies GE's characterizations of the Supply Agreement in paragraph 5.

6.      Paragraph 6 of the Complaint contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus CRM understands no response to be required. To the extent a response is required, CRM avers that the cited portions of the Supply Agreement speak for themselves; otherwise, CRM denies GE's characterizations of the Supply Agreement in paragraph 6.

7.      CRM denies the allegations in paragraph 7 of the Complaint.

7314654.5

8.     CRM denies the allegations in paragraph 8 of the Complaint, except to admit that CRM notified GE in the October 6, 2017 Notice of Discontinuance that CRM would discontinue production of the GEERs effective January 6, 2018, and respectfully refers the Court to the Notice of Discontinuance for a true and complete statement of its contents. *See* Dkt. No. 1-4.

9.     CRM admits the allegation in paragraph 9 of the Complaint that CRM was entitled to discontinue production of the GEERs prior to the expiration of the Supply Agreement; respectfully refers the Court to the Supply Agreement for a true and complete statement of the terms in Section 3, which speaks for itself; and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 9 of the Complaint, which are therefore denied.

10.     CRM denies the factual allegations in paragraph 10 of the Complaint, except to admit that the Supply Agreement does not specify a price (or a mechanism to determine a price) for a license of CRM's intellectual property ("IP"). The second sentence of paragraph 10 states a conclusion of law as to which no factual response is required, but to the extent a response is required, that statement is denied.

11.     CRM denies the allegations in paragraph 11 of the Complaint, except to admit that the U.S. Customer terminated its commercial agreements with GE citing problems with LocoVISION.

12.     CRM denies the allegations in paragraph 12 of the Complaint, except to admit that GE served CRM with a written indemnification demand and provided a copy of its settlement agreement with the U.S. Customer. The final sentence of paragraph 12 states a legal conclusion as

7314654.5

to which a factual response is not required, but to the extent a response is required, the statement is denied.

13.     CRM denies the allegations in paragraph 13 of the Complaint.

14.     CRM denies the allegations in paragraph 14 of the Complaint, except to admit that GE purports to seek the relief described and avers that GE is not entitled to such relief.

15.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint.

16.     CRM admits the allegations in paragraph 16 of the Complaint, except to deny that the listed address is current and avers that CRM's current address is 7900 Belfort Parkway, Suite 100, Jacksonville, Florida.

17.     CRM avers that paragraph 17 of the Complaint sets forth legal conclusions to which no response is required.

18.     Regarding the allegations in paragraph 18 of the Complaint, CRM respectfully refers the Court to the Supply Agreement for a true and complete statement of its terms, which do not call for a factual response and speak for themselves.

19.      CRM avers that paragraph 19 of the Complaint sets forth a legal conclusion to which no response is required.

20.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20, except to admit that, pursuant to the Supply Agreement, CRM manufactured and sold the GEER to GE, and GE sold the GEER for use by railroad customers on board their locomotives.

- 4 -

21.     Regarding paragraph 21 of the Complaint, CRM respectfully refers the Court to the Supply Agreement and Exhibit D of the Supply Agreement for a true and complete statement of its terms, which do not call for a factual response and speak for themselves.

22.     Regarding paragraph 22 of the Complaint, CRM respectfully refers the Court to the Supply Agreement and Exhibit D of the Supply Agreement for a true and complete statement of its terms, which do not call for a factual response and speak for themselves.

23.     Paragraphs 23-27 of the Complaint contain allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus no response is required. To the extent a response is required, CRM denies the allegations set forth in paragraphs 23-27 and respectfully refers the Court to the cited contractual language from the Supply Agreement, which speaks for itself.

28.     Regarding paragraph 28 of the Complaint, CRM respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which do not call for a factual response and speak for themselves.

29.     Paragraph 29 of the Complaint contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus no response is required. To the extent a response is required, CRM denies the allegations set forth in paragraph 29 and respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which speak for themselves.

30.     CRM denies the allegations in paragraph 30 of the Complaint and respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which speak for themselves.

7314654.5

31.     CRM avers that paragraph 31 of the Complaint sets forth legal conclusions to which no response is required and respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which speak for themselves.

32.     CRM denies the allegations in paragraph 32 of the Complaint and respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which speak for themselves, except to admit the allegation in footnote 3 that sub-provision 3(a)(b)(iii) of the Supply Agreement is not at issue.

33.     CRM denies the allegations in paragraph 33 of the Complaint, except to admit that CRM at times performed services requested by GE or customers as voluntary business accommodations and without being contractually obligated to provide those services.

34.     CRM denies the allegations in paragraph 34 of the Complaint and respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which speak for themselves and do not call for a factual response, except to admit that CRM sent GE the Notice of Discountenance dated October 6, 2017.  *See* Dkt. No. 1-4.

35.     With respect to the first sentence of paragraph 35, CRM respectfully refers the Court to the Notice of Discontinuance, which speaks for itself and does not call for a factual response. CRM otherwise denies the allegations in paragraph 35 of the Complaint and respectfully refers the Court to the Supply Agreement for a full and complete statement of its terms, which speak for themselves and do not call for a factual response.

36.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Complaint and avers that to the extent paragraph 36 sets

7314654.5

forth legal conclusions, no response is required; however, to the extent a factual response is required, CRM denies the allegations.

37.      CRM denies the allegations in paragraph 37 of the Complaint.

38.      CRM avers that to the extent paragraph 38 sets forth allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, no response is required, but to the extent a response is required, CRM denies the allegations in paragraph 38.

39.      CRM denies the allegations in paragraph 39 of the Complaint.

40.      CRM denies the allegations in paragraph 40 of the Complaint.

41.      Regarding the allegations in paragraph 41 of the Complaint, CRM respectfully refers the Court to the June 5, 2018 default notice sent to GE by the U.S. Customer for a full and complete statement of its contents, which speak for themselves. *See* Dkt. No. 25-5.

42.      CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Complaint, and so denies the allegations.

43.      CRM denies the allegations in paragraph 43 of the Complaint, except to aver that the email in question will speak for itself regarding its contents.

44.      CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 of the Complaint, and so denies the allegations.

45.      CRM denies the allegations in paragraph 45 of the Complaint.

46.      CRM denies the allegations in paragraph 46 of the Complaint, except to admit that the parties participated in a mediation in October 2018.

7314654.5

47.    CRM denies the allegations in paragraph 47 of the Complaint and respectfully refers the Court to the December 3, 2018 termination letter sent to GE by the U.S. Customer for a true and complete statement of its terms, which speak for themselves. *See* Dkt. No. 25-6.

48.    CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Complaint, and so denies those allegations.

49.    CRM denies the allegations in paragraph 49 of the Complaint, except to aver that to the extent paragraph 36 sets forth legal conclusions, no response is required.

50.    CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 of the Complaint, and so denies the allegations except to aver that the cited documents will speak for themselves.

51.    CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 of the Complaint, and so denies the allegations except to aver that the cited document will speak for itself.

52.    CRM denies the allegations in paragraph 52 of the Complaint.

53.    CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 of the Complaint, and so denies the allegations except to aver that the cited document will speak for itself.

54.    CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 of the Complaint, and so denies the allegations.

55.    CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 of the Complaint, except to admit that GE entered into a Settlement Agreement with the U.S. Customer on February 22, 2019 ("Settlement Agreement"), to

respectfully refer the Court to the Settlement Agreement for a full and complete statement of its terms, which speak for themselves, and to deny GE's characterization about the reasonableness of the settlement. *See* Dkt. No. 25-7 (under seal).

56.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56 of the Complaint, except to admit that GE provided CRM with a written indemnification demand.

57.     CRM admits that it refused to indemnify GE and has not compensated GE for GE's settlement payment to the U.S. Customer.

58.     Paragraph 58 of the Complaint contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus no response is required; however, to the extent a response is required, CRM denies the allegations set forth in paragraph 58 and avers that the cited document speaks for itself.

59.     Paragraph 59 of the Complaint contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus no response is required; however, to the extent a response is required, CRM denies the allegations set forth in paragraph 59.

60.     Paragraph 60 of the Complaint contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46, and thus no response is required; however, to the extent a response is required, CRM denies the allegations set forth in paragraph 60, except to admit that CRM devoted its engineers' time to address this issue, furnished GE with a proposed hardware solution to modify the GEER's power supply, and implemented the modification for GEERs later sold to the Canadian Customer.

61.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 of the Complaint, and so denies the allegations.

62.     CRM denies the allegations in paragraph 62 of the Complaint, except to admit that CRM modified the power supply in newly manufactured GEERs for the Canadian Customer.

63.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the Complaint, and so denies the allegations.

64.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 of the Complaint, except to aver that no response is required to the extent paragraph 64 sets forth legal conclusions or to extent paragraph 64 contains allegations pertaining to GE's express breach of warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46.

65.     CRM denies the allegations in paragraph 65 of the Complaint.

## **FIRST CAUSE OF ACTION**

### **(Breach of Express Warranty)**

66.     CRM avers that no response to paragraphs 66-76 of the Complaint is required to the extent that paragraphs 66-76 contain allegations pertaining to GE's breach of express warranty claim, which was dismissed pursuant to the Court's Order Dkt. No. 46; however, if a response is required, CRM denies the allegations in paragraphs 66-76 and repeats and realleges its responses to paragraphs 1 through 65 of the Complaint with the same force and effect as if set forth in full herein and denies liability.

7314654.5

## SECOND CAUSE OF ACTION

### (Breach of Contract)

77.     In response to paragraph 77 of the Complaint, CRM repeats and realleges its responses to paragraphs 1 through 76 of the Complaint with the same force and effect as if set forth in full herein.

78.     CRM admits the allegations in paragraph 78 of the Complaint.

79.     CRM denies the allegations in paragraph 79 of the Complaint, except to aver that no response is required to the extent paragraph 79 sets forth legal conclusions and that the cited contractual provision speaks for itself.

80.     CRM denies the allegations in paragraph 80 of the Complaint, except to aver that no response is required to the extent paragraph 80 sets forth legal conclusions and that the cited contractual provision speaks for itself.

81.     CRM denies the allegations in paragraph 81 of the Complaint.

82.     CRM denies the allegations in paragraph 82 of the Complaint and denies liability for GE's second cause of action.

## THIRD CAUSE OF ACTION

### (Indemnification for Losses Incurred Under the Supply Agreement)

83.     In response to paragraph 83 of the Complaint, CRM repeats and realleges its responses to paragraphs 1 through 82 of the Complaint with the same force and effect as if set forth in full herein.

84.     CRM admits the allegations in paragraph 84 of the Complaint.

7314654.5

85.     In response to the allegations in paragraph 85 of the Complaint, CRM respectfully refers the Court to the Supply Agreement for a true and complete statement of its terms, which speak for themselves.

86.     CRM denies the allegations in paragraph 86 of the Complaint, except to aver that no response is required to the extent paragraph 86 sets forth legal conclusions.

87.     CRM denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 of the Complaint, and so denies the allegation.

88.     CRM denies the allegations in paragraph 88 of the Complaint, except to admit that GE provided CRM with a written indemnification demand.

89.     CRM denies the allegations in paragraph 89 of the Complaint.

90.     CRM denies the allegations in paragraph 90 of the Complaint.

91.     CRM denies the allegations in paragraph 91 of the Complaint. CRM further states that to the extent that any allegation asserted in the Complaint is not specifically addressed herein, such allegation is hereby expressly denied. CRM denies liability on the third cause of action.

WHEREFORE, CRM avers that GE is not entitled to judgment against CRM on any grounds or to any of the relief requested in the Complaint and as summarized in paragraphs A through E of the Wherefore clause in the Complaint.

## AFFIRMATIVE DEFENSES

CRM raises the following affirmative defenses to the Complaint. By designating the following defenses as affirmative defenses, CRM does not concede that it bears the burden of proof or burden of persuasion as to any defense. CRM reserves the right to rely on any other affirmative

defense that may become apparent during fact or expert discovery and amend this pleading to assert additional defenses.

1.    The Complaint fails to state any claim upon which relief may be granted, fails to state facts sufficient to constitute the purported causes of action, and fails to plead a legally cognizable injury.

2.    Plaintiff's claims are barred in all or in part by the applicable statutes of limitation.

3.    Plaintiff's claims are barred in all or in part by the applicable statutes of repose.

4.    Plaintiff's claims are barred in all or in part by the doctrine of laches.

5.    Plaintiff's claims are barred in all or in part by the doctrine of waiver.

6.    Plaintiff's claims are barred in all or in part by the doctrine of estoppel.

7.    Pursuant to a mandatory forum selection clause as part of Plaintiff's settlement with the U.S. Customer, which Defendant has standing to enforce, the U.S. District Court for the Middle District of Florida is the correct venue for this action.

8.    Plaintiff's claims are barred in all or in part based on its settlement release of all claims in this action as part of Plaintiff's settlement with the U.S. Customer.

9.    Plaintiff's claims are barred in all or in part based on its failure to mitigate damages.

10.    Plaintiff's indemnification claim is barred in all or in part because its claimed losses did not arise from any act or omission of Defendant.

11.    Plaintiff's indemnification claim is barred in all or in part to the extent its claimed losses were attributable to the sole and direct gross negligence of Plaintiff.

12.    Plaintiff's antecedent breaches of express and implied contractual duties, as more fully set forth below in Defendant's third cause of action for breach of contract, including by failing

- 13 -

7314654.5

to provide specific technical and other information necessary for CRM to engage with the U.S. Customer on a solution to its network configuration issue, excused any alleged non-performance by CRM of contractual duties of indemnification under the Supply Agreement.

<u>COUNTERCLAIM FOR DAMAGES</u>

Defendant and Counterclaim Plaintiff CRM submits the following counterclaim against Plaintiff and Counterclaim Defendant GE and alleges as follows:

<u>PARTIES</u>

1.    CRM is a limited liability company organized under the laws of the State of Florida, whose sole individual member is a resident of Florida. CRM is a supplier of rail components to various companies in the rail industry in North America.

2.    Upon information and belief, Plaintiff and Counterclaim Defendant GE is a limited liability company organized under the laws of the State of Delaware; its sole member is GE Transportation, a Delaware corporation with its principal place of business in Pennsylvania. *See* Dkt. No. 28.  GE Transportation is a supplier of locomotives and rail components and is indirectly owned by Westinghouse Air Brake Technologies Corporation (Wabtec), a rail conglomerate.  *See id*.

<u>JURISDICTION AND VENUE</u>

3.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship. The action is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  *See* Dkt. No. 28.

4.    This Court has personal jurisdiction over GE: (1) pursuant to N.Y. C.P.L.R. § 302(a)(1) because GE has purposefully transacted business in this state and there is a substantial

7314654.5

relationship, as set out herein, between that transaction of business and the counterclaims asserted below by CRM; and (2) in accordance with the Due Process Clause of the United States Constitution. GE consented to jurisdiction in this forum by entering the contract at issue in this action pursuant to an assignment from General Electric Company, including by accepting a forum selection clause to submit "generally and unconditionally" to personal jurisdiction in New York in any action brought thereunder. As a sophisticated corporate entity, GE could contemplate being subject to personal jurisdiction in this state based on conduct arising out of its transaction of business with CRM under the three-way contractual arrangement at issue. Moreover, there is a substantial identity of personnel and business operations between GE and its corporate predecessor the GE Transportation division of General Electric Company; therefore, the forum contacts of the former entity, a New York corporation, are imputed to GE as its corporate successor in interest for purposes of the contract at issue in this action.

5.      In its memorandum and order dated June 1, 2020, Dkt. No. 46, this Court denied CRM's motion to transfer, dismiss, or stay this action to allow for enforcement in the Middle District of Florida of a release of claims and another forum selection clause recently agreed to by GE, and held that the case instead should proceed in its entirety in the Southern District of New York, including as to questions related to intellectual property licensing. CRM respectfully disagrees with the Court's underlying contractual and legal analysis in various respects, and regards the Middle District of Florida as the correct venue for this entire action. However, because it appears appellate review of the Court's venue decision, if any, must await a final judgment, CRM intends to preserve that issue while proceeding in accordance with the Court's decision.

## ALLEGATIONS OF FACT COMMON TO ALL CLAIMS

### The U.S. Customer and Its Termination Decision

6.    GE and CRM were part of a three-way contractual arrangement with the U.S. Customer referred to in GE's Complaint. Dkt. No. 1.

7.    Under that arrangement, General Electric Company contracted with the U.S. Customer to supply LocoVISION camera systems as well as event recorders called GEERs, which function like black boxes on commercial aircraft; in turn, General Electric Company engaged CRM to manufacture and sell GEERs for installation on the customer locomotives.

8.    Upon information and belief, General Electric Company later assigned its interest in those contracts to GE Transportation Parts, LLC. *See* Dkt. No. 1, n.1.

9.    In this pleading, General Electric Company and GE Transportation Parts, LLC are together referred to as GE, except where necessary to differentiate them. The contract between GE and CRM regarding the GEERs is the Supply Agreement made effective November 16, 2015, which was filed as an exhibit to the Complaint.  *See* Dkt. No. 1-2.

10.    CRM had no involvement in the development, production, or sale of GE's LocoVISION camera systems and was never a party to the LocoVISION contract between GE and the U.S. Customer.

11.    Under its contractual dealings with the U.S. Customer, GE committed that the GEERs were capable of 3-in-1 data recording. They were designed to record three types of data in crash-hardened memory: (1) positive-train-control data, or PTC data; (2) locomotive data; and (3) video data recorded by a camera system, such as LocoVISION.

12.    Starting from their initial production in 2016, the GEERs have been 3-in-1 capable:

- 16 -

That is, they have been capable of recording all three types of data, including video data; there is no internal defect rendering the GEERs incapable of recording video data.

13.    As early as 2016 and continuing through at least December 2017, GE and CRM personnel participated in tests confirming that the GEERs recorded all three types of data, including video data. Therefore, GE has long understood that the GEERs are 3-in-1 capable.

14.    To CRM's knowledge, GE has never claimed that the GEERs are generally incapable of recording video data due to an internal system defect.

15.    However, upon information and belief, GE has misled customers into believing that CRM or the GEERs are responsible for a failure in 3-in-1 recording, without accurately explaining to customers that issues separate from the GEERs have prevented video data from flowing into the GEERs for recording.

16.    Two issues extrinsic to the GEERs have prevented video data from flowing into them for recording.

17.    First, the LocoVISION camera systems have been plagued since the early stages of their development with reliability and stability problems.

18.    Upon information and belief, GE's failure over successive years to produce a reliable, functioning LocoVISION camera system ultimately caused the U.S. Customer to seek an alternative camera system vendor and terminate its LocoVISION contract with GE.

19.    A secondary issue involved the configuration of the U.S. Customer's local area network on board its locomotives. This issue had to do with how data flowed among various separate components within the customer's network—akin to how data moves among multiple devices within an office or home network.

- 17

7314654.5

20.     Specifically, due to the configuration of the customer's network, data flowed in a continuous loop among the separate networked components; the data did not enter the GEERs for recording in crash-hardened memory, even though the GEERs were capable of recording that data.

21.     For clarity, this networking issue did not concern the GEERs' internal capability to record data, but rather whether data actually flowed into the GEERs for recording. By analogy, a home or office computer can be functional as a standalone device, yet for extrinsic network configuration reasons (such as an incorrect wi-fi passcode) may be unable to connect to other devices within a network.

22.     GE notified CRM of the network data loop in connection with its testing of LocoVISION.

23.     CRM responded that although it believed it was not contractually obligated to perform networking services under its Supply Agreement with GE, CRM would investigate the issue as a voluntary business accommodation to GE and the customer.

24.     Over ensuing weeks, CRM devoted engineering time to diagnose the issue and design a port-isolation solution to resolve the network data loop. CRM furnished a design document to GE, which identified the cause of the loop and recommended port isolation as the appropriate solution.

25.     Port isolation involves creating a logical break in data flows across an ethernet switch even though more than one physical connection may exist. This approach, as designed by CRM, would break the data loop experienced by the U.S. Customer. In email communications with GE and CRM, the U.S. Customer stated that its network engineers preferred the port-isolation approach designed and recommended by CRM.

7314654.5

26.    However, GE never authorized CRM to proceed with implementing the port-isolation solution for the U.S. Customer.

27.    GE instead preferred exploring other potential approaches, but did not furnish CRM necessary technical information to evaluate those approaches. For example, GE suggested a "virtual local area network," or VLAN, approach to address the network loop, but never furnished the required network information despite periodic requests from CRM in 2018.

28.    CRM offered to implement an open configuration that would populate all of the network components (using ethernet switch configuration registers) with whatever specific register values GE determined.

29.    This approach would have afforded GE control over the network configuration.

30.    However, GE never furnished the register values and did not follow up regarding this approach, even though GE had originally suggested it.

31.    From the time CRM furnished the port-isolation design document, GE failed to make sustained or meaningful efforts to resolve the data loop according to the U.S. Customer's stated preference for CRM's recommended port-isolation approach.

32.    Upon information and belief, GE did not follow through because it had far more acute technical challenges with its own LocoVISION camera systems, which consumed most of the time and attention of its engineering personnel.

33.    Upon information and belief, GE has had longstanding and well-documented problems with the LocoVISION system.

34.    This included problems with the LocoVISION cameras as well as separate problems with a LocoVISION card ("LCV Card") whose function is to collect and manage the data streams

- 19 -

generated by the cameras.

35.    The problems with LocoVISION impacted the GEERs, in that if the LocoVISION cameras or the LCV Card failed to capture video data due to one or more technical malfunctions, that missing data did not exist to be recorded. That is, recording was impossible because the data did not exist.

36.    In June 2018, the U.S. Customer issued a default notice to GE, in which it required GE to cure the problems with LocoVISION reliability and performance. *See* Dkt. No. 25-5.

37.    GE withheld essential information about the default from CRM, which frustrated CRM's ability to manage risks from LocoVISION's system reliability problems, including to engage with GE and the U.S. Customer on possible solutions or workarounds.

38.    GE compounded this failure by directing CRM not to communicate with the U.S. Customer about matters related to their three-way contractual arrangement.

39.    GE's acts and omissions impaired CRM's opportunity to manage the risks presented by LocoVISION's longstanding performance problems.

40.    In October 2018, GE renewed discussions with CRM directly and through counsel about a package of software services that GE wanted CRM to perform, which included discussions of CRM implementing a solution to the network data loop for the U.S. Customer.

41.    In these discussions, CRM again recommended port isolation as the optimal solution, and this time GE seemed prepared to accept CRM's recommendation.

42.    Shortly before Thanksgiving, CRM offered to implement port isolation or otherwise engage with the customer on its needs, even as the parties continued to negotiate about other software licensing and service issues.

- 20

43.     However, GE still did not authorize direct engagement between CRM and the U.S. Customer regarding the customer's needs.

44.     Nevertheless, CRM persisted in seeking GE's approval to proceed with port isolation and engage the U.S. Customer.

45.     These included written requests through counsel on November 21, November 27, and December 10, 2018 for GE to authorize CRM to proceed with port isolation or otherwise to engage with the U.S. Customer on its needs.

46.     GE did not provide a substantive response to any of those requests.

47.     Unbeknownst to CRM until months later, the U.S. Customer issued a notice to GE in December 2018 terminating the LocoVISION contract, stating that GE had failed to cure the reliability and performance problems with the LocoVISION system.  *See* Dkt. No. 25-6.

48.     At no time in 2018 did GE convey to CRM the risk of a termination of the LocoVISION contract or the seriousness of the problems it was having with the U.S. Customer.

49.     In particular, GE never notified CRM at any time during 2018 of a risk of termination due to any issues involving the GEERs or the network data loop issue.

50.     Upon information and belief, the U.S. Customer never cited the network data loop as a basis for its decision to terminate the LocoVISION contract.

51.     Upon information and belief, the U.S. Customer had already determined to stop using the LocoVISION camera system even before its termination letter dated December 3, 2018.

52.     Upon information and belief, by that date the U.S Customer had investigated and already selected another camera system vendor to replace GE's LocoVISION system.

53.     The December 3 termination letter did not direct GE to remove the GEERs from the

- 21 -

customer's locomotives; instead, it requested GE's cooperation to assist in integrating the GEERs with a replacement system. Dkt. No. 25-6.

54.    The GEERs are capable of 3-in-1 recording, including by recording video data from camera systems made by GE or other vendors.

55.    However, upon information and belief, in communications with the U.S. Customer, GE used the GEERs' supposed lack of 3-in-1 recording capability as a pretext to blame CRM falsely for the termination, and thereby seek to shift the costs of termination to CRM.

56.    From December 2018 through February 2019, all unbeknownst to CRM, GE negotiated with the U.S. Customer about the termination of the LocoVISION contract, the return of the LocoVISION systems as well as the GEERs, and a settlement of their dispute. This process culminated in a Settlement Agreement dated February 22, 2019, which contained a mutual release of all claims related to LocoVISION and the GEERs. *See* Dkt. No. 25-7 (under seal).

57.    GE did not contemporaneously inform CRM of any of the developments summarized in the preceding paragraph, even though GE knew they would adversely impact CRM's interests under the Supply Agreement.

58.    GE's withholding of these developments frustrated CRM's ability to protect its contractual interests, not least by ensuring that the U.S. Customer was accurately informed of all material facts related to GEERs' recording capabilities, their ability to be integrated with other vendors' camera systems, and other material facts related to the default and termination notice under the LocoVISION contract, and the GEERs' functionality.

59.    During the period of settlement negotiations, GE made various misrepresentations to the U.S. Customer about CRM's willingness to address the network data loop issue and negotiate

- 22 -

a software license with GE on mutually acceptable terms.

60.    In particular, GE portrayed CRM as having refused to implement a solution to the data loop experienced by the U.S. Customer, which was false, and as having denied GE a software license, which was false or materially misleading; and further GE portrayed the GEERs as generally incapable of 3-in-1 recording, which was false.

61.    The misrepresentations made by GE were included in the February 22, 2019 Settlement Agreement with the U.S. Customer, and they necessarily were part of other communications between GE and the U.S. Customer related to the settlement of their dispute, including drafts of the Settlement Agreement.

62.    GE's statements to the U.S. Customer were false or materially misleading because: (1) CRM never refused to address the network data loop; (2) in fact, CRM had designed and recommended a solution preferred by the U.S. Customer, and offered repeatedly to implement it, which GE ignored; (3) CRM did not deny GE rights to its software and made a series of fair license proposals in 2018; (4) it was GE—not CRM—that repeatedly broke off licensing negotiations in 2018, including by failing to respond to CRM's most recent license offer; (5) CRM engaged GE constructively on its suggested VLAN solution to the network loop, but GE failed despite repeated requests to furnish the necessary technical information to proceed; and (6) the GEERs were capable of recording video data from LocoVISION or other vendors' camera systems.

63.    GE's false or materially misleading assertions about CRM and the GEER formed part of GE's settlement with the U.S. Customer and caused the customer to return the GEERs.

64.    The U.S. Customer relied on GE's false or materially misleading assertions including by accepting their inclusion in the Settlement Agreement.

65.    If GE had communicated with the customer and CRM in a timely, accurate, fair and non-misleading way, starting from the June 2018 default notice, then CRM could have promptly addressed any customer concerns about the network data loop to its satisfaction. By GE's having misrepresented CRM's positions to the customer, CRM was deprived of an opportunity to engage the customer and attempt to salvage the arrangement at least with respect to the GEERs.

66.    Upon information and belief, had it not been for the multiyear performance problems associated with LocoVISION, the U.S. Customer would not have had occasion to declare GE in default, terminate the LocoVISION contract, or return the LocoVISION systems or the GEERs.

67.    Upon information and belief, GE's own failure to supply the U.S. Customer with a reliable camera system within the time expected by the customer caused the U.S. Customer to look for alternative camera system vendors, terminate its contracts with GE, and return the LocoVISION system and all of the GEERs.

68.    GE did not notify CRM of the seriousness of its problems concerning LocoVISION, the termination notice, its settlement negotiations, or its settlement with the U.S. Customer until after the settlement was complete; only then did GE present CRM with a demand for full indemnification as a *fait accompli*.

69.    GE's demand for indemnification included a claim for CRM to pay for GE's costs to repurchase its own nonperforming camera systems, even though CRM had nothing to do with their design or manufacture. In addition, GE claims a windfall by demanding that CRM pay for GE's repurchase of GEERs that it resold to another customer.

70.    Upon information and belief, GE's conduct in connection with the termination was undertaken with the specific purpose to harm CRM's interests, or with reckless indifference to

7314654.5

such harm, by inventing false or misleading claims about the GEERs' recording capability and CRM's willingness to address the network loop or grant a software license, all in order to force CRM to bear the full costs of termination.

71.    The loss of the specific GEER business opportunity due to GE's misrepresentations harmed CRM by depriving it of a source of revenues in the specifically itemized forms set out in the claim below.

72.    In January 2020, GE raised issues like those experienced by the U.S. Customer, albeit involving another customer's network.

73.    CRM again recommended port isolation as the way to address the issues.

74.    This time GE was receptive to CRM's proposed solution and authorized further discussions between the parties.

75.    CRM promptly developed a prototype, which passed preliminary tests conducted by the parties in Fort Worth, Texas. The parties thereafter reached a concise standalone agreement for CRM to implement the port-isolation solution subject to various terms and conditions, which included obtaining advance approval from the customer and consideration for CRM's services.

76.    CRM's port-isolation design was essentially unchanged from what it presented to GE two years earlier.

77.    If GE had engaged with CRM in 2018, including by authorizing CRM to proceed with the port-isolation solution, then CRM could have implemented the solution for the U.S. Customer in a matter of weeks.

**GE's Licensing Negotiations**

78.    As a backdrop for the parties' dispute, GE did not negotiate or secure an agreement

for CRM to perform software services related to the GEERs as part of their Supply Agreement.

79.   The parties later attempted to negotiate a software services agreement in 2016; however, GE disengaged from those discussions without reaching an agreement.

80.   The absence of an agreement did not deter GE from approaching CRM repeatedly in 2016 and 2017—often with little notice—and insisting that CRM devote time to implement new software features or utilities sought by GE or a customer.

81.   In its requests for additional software services in 2016 and 2017, GE never offered CRM compensation for its engineers' time to perform those additional services or other consideration for the additional requested services.

82.   For clarity, the software work requests referred to herein did not involve warranty work, such as if a GEER had failed in the field and needed repair or replacement.

83.   Instead, the nature of GE's software requests in 2016 and 2017 was for CRM to develop software in order to do something different or new.

84.   When CRM received such requests, it consistently took the position in discussions and emails with GE that CRM was not contractually obligated under the Supply Agreement to perform additional software services, but it would do so without prejudice as a voluntary business accommodation to the customer and GE.

85.   By autumn 2017, CRM informed GE that it could not continue performing additional software services for GE or customers without a mutually acceptable services arrangement that would include fair compensation for CRM engineers' time.

86.   In October 2017, GE sent a proposal to CRM, in which GE: furnished information about how GE valued the GEER business opportunity going forward; proposed transferring the

- 26

GEER intellectual property (IP) to GE; and requested that CRM perform a wide range of additional software services.

87.    CRM viewed the economics of GE's proposal as untenable and determined to discontinue the GEER component and curtail its arrangement with GE; CRM conveyed its views about the proposal to GE.

88.    In a notice dated October 6, 2017, CRM exercised an express contractual right under the Supply Agreement to discontinue its supply of GEERs. CRM and GE later agreed to a bulk sale of GEERs, satisfying one of CRM's obligations in the event of a discontinuance.

89.    Additionally, CRM has offered GE numerous license proposals that CRM regarded as fair and reasonable, even as CRM remained open to comments and input from GE.

90.    In its Complaint, GE claimed that CRM's license proposals were too high or unsupported by a reasoned methodology; however, GE's own conduct raised questions of whether it was negotiating in good faith or genuinely sought a license for fair value.

91.    Section 3(a) of the Supply Agreement did not require CRM to produce a valuation, but CRM elected to do so for the sake of full transparency.

92.    Contrary to GE's claim that the model shared by CRM included assumptions or data known by CRM to be false, most of the data elements and assumptions in fact originated from GE, based on information GE had furnished to CRM in October 2017.

93.    In that information furnished by GE, GE had projected GEER sales and outlined the GEER business opportunity from GE's standpoint. CRM incorporated GE's own data and assumptions into a discounted cash flow (DCF) model that sought to derive a value for CRM's intellectual property (IP) based on GE's own data.

94.    CRM furnished the DCF model to GE on November 20, 2017 and invited GE to provide comments or make any suggested revisions to the model that it felt were warranted.

95.    CRM expected that GE, had it disagreed with any underlying data or assumptions, would engage constructively to arrive at a timely and mutually acceptable valuation.

96.    GE did not object to any aspects of the DCF model when it started to negotiate a software license with CRM in early 2018.

97.    Indeed, GE never raised any issue with the model until later in 2018, when it began accusing CRM of commercial unreasonableness in the negotiations. Upon information and belief, GE's attacks were disingenuous considering that the model used GE data and assumptions and GE never proposed any contemporaneous revisions to the model, as CRM had invited.

98.    The DCF model using GE's data pointed to an overall valuation of the GEER business opportunity of $5.6 million.

99.    Of all elements contributing to the GEER's business valuation, CRM believed that hardware and software IP—the know-how that makes the GEER a reliable product—were the main components of that value.

100.   After inviting comment on the DCF model and affording GE two months to comment, on January 15, 2018, CRM made an IP transfer proposal to GE. CRM offered three pathways depending on which components GE wished to license. The first pathway involved an unlimited license encompassing all hardware and software IP associated with the GEERs, which CRM offered to license for a one-time fee of $3.6 million. The second pathway involved a pared-down license encompassing a board support package ("BSP") valued at $325,000, together with a minimum last-time purchase of 250 GEERs. The third pathway involved a base software license

- 28 -

and BSP valued at $1.8 million, with a minimum last-time purchase of 250 GEERs.

101.  When GE responded to CRM's proposal, it did not assert that the three pathways were overvalued given the information GE had furnished to CRM the preceding October.

102.  Rather, in a January 29, 2018 email, GE's representative stated GE's preference to negotiate based on the second pathway consisting of the BSP license and minimum purchase.

103.  Based on GE's preference, CRM duly instructed its counsel to prepare a draft agreement that summarized the material terms of what GE had said it wanted. However, in follow-up discussions a short while later, GE revealed that it had no intention to commit to a minimum purchase and asked to reprice the proposal based on the BSP license.

104.  When CRM revised its proposal, GE moved the goalposts again.

105.  On March 29, 2018, GE asked CRM to price a full software license, similar to the third pathway contained in CRM's January 15, 2018 proposal.

106.  In a meeting in April 2018, CRM offered a full license of the GEER software to GE for $1.8 million. Meanwhile GE requested an array of software modifications.

107.  On June 13, 2018, GE presented CRM with a draft agreement for the full software license and additional software services. In a cover email, GE's representative noted that CRM had requested $1.8 million for the full software license in the April meeting, whereas GE had considered $800,000 to be a reasonable price. He continued that GE would offer CRM $1.4 million for the full software license to close out the matter.

108.  The parties met to discuss GE's proposal on July 3, 2018. The topics included the parties' views on the appropriate license fees and the scope of future obligations for CRM to provide the software services requested by GE.

109.  At the meeting, CRM requested backup for GE's pricing proposal.

110.  GE's representatives promised to share the backup for its $1.4 million proposal.

111.  GE also committed to incorporate the points of discussion at the meeting into a redlined draft and return the draft to CRM by July 6, 2018.

112.  CRM emerged from the meeting optimistic that a deal was in sight: The parties' positions seemed close on license fees, and CRM remained open to considering GE's backup in an effort to converge on a mutually acceptable fee. Otherwise, what remained from CRM's standpoint was clarifying the scope of future software services requested of CRM.

113.  For reasons GE never saw fit to explain, it simply disengaged from the negotiation.

114.  GE never furnished the backup for its own $1.4 million proposal, as it had promised; nor did it provide any redline edits by July 6.

115.  Seeking to conclude the negotiation, CRM redlined GE's proposal itself and sent the draft back to GE on July 17, 2018. CRM remained open even then to considering a reduction of the license fee to account for GE's promised pricing backup.

116.  However, GE ignored this and stopped negotiating without explanation.

117.  Much of the delay in the negotiations during 2018 resulted from: GE's abrupt shifts in its positions about which software components it wanted to license and which it wanted CRM to develop; GE's failure to follow up on open issues or proposals in a transparent and timely way; its failure to furnish items specifically promised to advance the negotiation; and its abrupt ending of negotiations for months without explanation.

118.  In the autumn GE sought to restart negotiations under the auspices of mediation.

119.  CRM was uncertain what "dispute" existed between them, given that CRM had an

7314654.5

open licensing offer that GE simply ignored and was awaiting GE's pricing backup, which was promised but never provided. Nevertheless, CRM agreed to mediation in the spirit of attempting to reach a mutually acceptable software license and services agreement. CRM proposed engaging a joint valuation expert if the main issue separating the parties concerned a mutually acceptable license fee; however, GE rejected this without explaining why.

120.  CRM made its final software licensing proposal to GE for a discounted license fee of $1.35 million, which it conveyed to GE through counsel on November 8, 2018.

121. However, once again GE ignored the offer and stopped negotiating without any explanation.

122.  Throughout the license negotiations in 2018, GE never furnished its own valuation or backup for its proposals to CRM, even after committing to do so.

123.  GE's overall course of conduct during license negotiations impressed CRM as commercially unreasonable, arbitrary, capricious, and indicative of bad faith.

## FIRST CAUSE OF ACTION

### Product Disparagement / Injurious Falsehood

124.  CRM realleges and incorporates by reference paragraphs 1 through 123 of the Counterclaim as if fully set forth herein.

125.  GE misled the U.S. Customer into believing that CRM or the GEERs were somehow responsible for a failure in 3-in-1 recording.

126.  GE made false or materially misleading statements to the U.S. Customer that the GEERs lack 3-in-1 recording capability, when it knew that the GEERs in fact *were* capable of recording the three types of data and that issues extrinsic to the GEERs prevented video data from

7314654.5

flowing into the GEERs for recording.

127.  GE made false or materially misleading statements to the U.S. Customer that CRM had refused to address the network data loop experienced by the customer, when it knew that in fact CRM had designed a solution preferred by the customer and offered to implement it for the customer even as the parties continued to negotiate other issues.

128.  GE made false or materially misleading statements to the U.S. Customer that CRM had denied GE a technology license, when it knew that CRM had a pending license offer and it was GE—not CRM—that repeatedly broke off license negotiations in 2018.

129.  GE's false and materially misleading statements were incorporated into its February 22, 2019 Settlement Agreement with the U.S. Customer and, upon information and belief, in related communications between them, including drafts of the Settlement Agreement.

130.  Upon information and belief, GE portrayed CRM in a false light in its communications with the U.S. Customer, for the specific purpose of shifting the blame for its own LocoVISION system failures to CRM. Upon information and belief, GE used the network data loop issue and supposed lack of 3-in-1 recording capability as a pretext to attempt to force CRM to bear the full costs of its settlement payments to the U.S. Customer.

131.  As a direct and proximate result of GE's false or materially misleading statements to the U.S. Customer, CRM was denied an opportunity to engage with the U.S. Customer in order to address the data loop, integrate the GEERs with a replacement camera system vendor, or otherwise seek to preserve a business opportunity at least with respect to the GEER.

132.  Upon information and belief, the U.S. Customer relied to its detriment on the false or materially misleading statements made by GE in deciding to return the GEERs, which disrupted

- 32 -

the U.S. Customer's operations needlessly by causing it to remove and return a functional system in the GEERs and seek an alternative event-recorder vendor, even though the GEERs were 3-in-1 capable and otherwise met the customer's needs.

133. The loss of the specific event-recorder business opportunity due to GE's misrepresentations harmed CRM by depriving it of earnings in the form of (1) new sales of event recorders for use by the U.S. Customer, estimated as at least $12.2 million, (2) sales of GEER repair parts for units in the U.S. Customer's fleet that were out of warranty, (3) additional software services for the U.S. Customer, estimated as $288,000 per year, and (4) software license revenues associated with event recorders in the U.S. Customer's fleet, estimated as at least $48,000.

134. But for GE's disparagement of the GEERs' capabilities and CRM's willingness to support the customer, CRM stood ready to sell additional event recorders for installation and use by the U.S. Customer as part of the customer's planned transition of its entire fleet of locomotives away from the customer's legacy event recorder and to the 3-in-1 system made by CRM, which was capable of recording video data.

135. For larger freight operators like the U.S. Customer, not every item of planned service can feasibly be performed in every year; for example, upgrades or improvements are often scheduled to take place over multiple years, in order to minimize operational disruption from locomotive downtime while still according with regulations that impose fixed schedules for critical items of locomotive servicing.

136. For new component installations, these operating constraints meant that service was planned and budgeted to take place over several years based on a set "application rate," or the rate at which upgraded components could be applied feasibly to the locomotives in the fleet during

each year. The application rate depends on factors such as fleet size, average locomotive age, operating conditions, the number and capacity of repair facilities, and the extent of other required maintenance needs. Another factor involves limiting the time that a single locomotive must be offline at a central service facility to undergo necessary repairs, upgrades, new component installations, tests, or other service items. The goal is to limit locomotive downtime, which usually ranges from several hours or days, to a week or more, depending on the extent of service required.

137. These scheduling factors and operating constraints meant that the U.S. Customer budgeted for and ordered new components, including event recorders, for the coming year based on estimates of what could be installed on those locomotives undergoing service. To manage cost, the U.S. Customer purchases enough inventory for the coming year but avoids purchasing excess inventory.

138. According to CRM's familiarity with the U.S. Customer's operating practices, its application rate for event recorders was forecast as several hundred locomotives per year.

139. Had it not been for GE's product disparagement of the GEERs, the U.S. Customer would have proceeded in 2019 to install all GEERs remaining in its inventory as part of its scheduled locomotive servicing in 2019.

140. As of the time of its settlement with GE, the U.S. Customer had installed only 30 GEERs; it had another 265 GEERs in inventory to be applied to its locomotives, which would have met the customer's needs through most or all of 2019.

141. According to CRM's familiarity with the U.S. Customer's planning and purchasing practices as well as CRM's overall industry experience, the customer's next purchase was expected in late 2019 in order to account for installations in 2020. Therefore, CRM began to suffer special

- 34 -

losses from lost sales of event recorders starting in late 2019, when the customer was set to make its next order.

142.  Based on a reasonable application rate, the U.S. Customer's purchases would have yielded in excess of $2 million in annual revenues starting in late 2019 and continuing thereafter until the customer's entire locomotive fleet was fully upgraded. CRM's additional items of special losses, as recited above, relate to lost event-recorder sales starting in late 2019, such as lost repair parts sales and lost software service requests related to those lost event-recorder sales. Multiyear upgrades, as described in paragraphs 134 through 141, are a normal and expected practice in the rail industry in general and for the U.S. Customer in particular.

143.  Upon information and belief, GE published the foregoing misrepresentations to the U.S. Customer in Florida, where the customer was based.

144.  CRM felt the injury of losing the GEER business opportunity with the U.S. Customer in Florida, where CRM is based.

145.  CRM contends that Florida law applies to its claim for product disparagement or injurious falsehood. *See Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994) (discussing the interest analysis used by New York courts to determine the choice of law in the context of tort cases and finding that where the rule at issue is primarily conduct-regulating, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders" (quoting *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993)); *La Luna Enters. v. CBS Corp.*, 74 F. Supp. 2d 384, 388-89 (S.D.N.Y. 1999) (noting that in cases involving defamatory material published in the claimant's domicile, New York courts usually find that state of domicile to have to the most significant

relationship to the case).

## SECOND CAUSE OF ACTION

### Violations of the Florida Deceptive and Unfair Trade Practices Act

146. CRM realleges and incorporates by reference paragraphs 1 through 145 of the Counterclaim as if fully set forth herein.

147. CRM and the U.S. Customer are each based in Florida.

148. Upon information and belief, GE published its misrepresentations regarding the GEER, as alleged above, to the U.S. Customer in Florida.

149. As a result of GE's misrepresentations to the U.S. Customer in Florida, CRM has felt the loss of GEER business from the U.S. Customer in its home state of Florida.

150. At all times relevant to this pleading, GE was involved in the conduct of trade and commerce as defined under the Florida Deceptive and Unfair Trade Practices Act (the "Act"), Fla. Stat. § 501.203(8).

151. At all times relevant to this pleading, the U.S. Customer was a "consumer" as defined by Fla. Stat. § 501.203(7).

152. GE's false or materially misleading statements to the U.S. Customer regarding the GEERs, as described above including in paragraphs 59 through 64 and 125 through 130, were deceptive or unfair acts or practices in the conduct of trade or commerce in violation of Fla. Stat. § 501.204.

153. The false or materially misleading statements made by GE to the U.S. Customer included statements contained in the Settlement Agreement dated February 22, 2019 and, upon information and belief, in related communications between GE and the U.S. Customer, including

7314654.5

drafts of the Settlement Agreement.

154.  Upon information and belief, the U.S. Customer relied to its detriment on the false or materially misleading statements made by GE in deciding to return the GEERs, which needlessly disrupted the U.S. Customer's operations by: (a) causing it to remove and return GEERs even though they were fully 3-in-1 capable and otherwise met the customer's needs; and (b) requiring it to unnecessarily search for and engage another event recorder vendor.

155.  The U.S. Customer, as a business entity purchasing the GEER product, thereby sustained a cognizable consumer injury as a result of GE's deceptive conduct within the meaning of the Act.

156.  As a direct and proximate result of GE's false or materially misleading statements to the U.S. Customer, all in violation of Fla. Stat. § 501.204, CRM was denied an opportunity to engage with the U.S. Customer in order to address the network data loop, integrate the GEERs with an alternative camera system vendor, or otherwise salvage the GEER business opportunity, and therefore suffered damages that include its lost profits.

157.  Pursuant to Fla. Stat. § 501.211 and § 501.2105, CRM is entitled to recover actual damages, reasonable attorneys' fees, and costs.

## THIRD CAUSE OF ACTION

### Breach of Contract

158.  CRM realleges and incorporates by reference paragraphs 1 through 157 of the Counterclaim as if fully set forth herein.

159.  GE owed CRM express and implied contractual duties under the Supply Agreement, including duties: (1) to provide CRM with all technical information necessary to integrate the

7314654.5

GEERs with the U.S. Customer's network and implement a solution to the network configuration issue experienced by that customer; (2) to bolster customer confidence in the GEER as a product capable of 3-in-1 recording; and (3) to refrain from taking commercially unreasonable actions and making material misrepresentations about the GEER whose natural and foreseeable consequence was to erode the U.S. Customer's confidence in the GEER and thereby frustrate CRM's contractual expectancy under the Supply Agreement.

160.  Those duties arise, *inter alia*, under: §§ 2(b) and 2(i) of the Supply Agreement; Exhibit C to the Supply Agreement; and the implied covenant of good faith and fair dealing, which prevented GE from undertaking commercially unreasonable, bad faith, arbitrary or capricious actions to frustrate CRM's reasonable expectations under the Supply Agreement.

161.  At various times and places, including as set forth above, GE violated its express and implied contractual duties to CRM, including: (1) by misinforming customers about the GEERs' recording capability and CRM's willingness to undertake certain actions related to the GEERs, such as implementing a solution to the U.S. Customer's network issue or offering GE rights to CRM's GEER software on fair terms; (2) by failing to provide CRM all technical information necessary to resolve customer issues related to the GEERs or related products, services, or utilities, despite requests from CRM and at times from customers; (3) by withholding from CRM critically important information about GE's issues with the U.S. Customer in 2018 centered on LocoVISION's reliability and stability problems—including the default and termination notices issued by the customer—until it was too late for CRM to engage with the customer or undertake actions aimed at mitigating the underlying issues; (4) by erroneously blaming CRM and the GEERs for non-performance when GE knew or reasonably should have known through

- 38 -

appropriate investigations that issues extrinsic to the GEERs were responsible for the alleged non-performance; and (5) by eroding overall customer confidence in the GEERs' ability to provide 3-in-1 recording capability, including their ability to record video data from the LocoVISION camera system or other vendors' systems.

162. GE's specific breaches included: GE's failure to provide the network registers required to implement a VLAN solution to the U.S. Customer's network issue despite multiple requests from CRM in 2018, as alleged in paragraphs 24 through 31; GE's failure to keep CRM informed of the acute problems it was experiencing with the U.S. Customer in connection with LocoVISION, as alleged in paragraphs 32 through 51; and GE's misinformation provided to the U.S. Customer about GEER functioning and capabilities, as alleged in paragraphs 59 through 64 and 125 through 130 above.

163. GE's breaches imposed material commercial injury on CRM by misleading the U.S. Customer to believe that the GEERs were not 3-in-1 capable, and thus causing the customer to stop further use or purchases of CRM's recorders even though they were in fact capable of recording all three types of data, including video data captured by camera systems developed by GE or other vendors. These breaches destroyed or frustrated CRM's reasonable expectancy to sell the U.S. Customer additional event recorders needed to complete the customer's planned upgrade of its fleet of roughly 2,400 locomotives.

164. In late 2019, GE again breached its duties to CRM under the Supply Agreement by failing to provide critical information to CRM and the Canadian Customer regarding a modification that GE had made to its software, which caused a malfunction of the customer's locomotive event data streaming systems.

7314654.5

165. This issue was sensitive because it concerned a major order by the Canadian Customer of roughly a dozen new locomotives sold by GE or its affiliates, each valued at several million dollars. Faced with the malfunction, the customer notified GE that it was suspending the order unless and until the problems were rectified. That is, the Canadian Customer threatened not to proceed with a major locomotive purchase valued in the tens of millions of dollars due to the system malfunction caused by GE.

166. During initial interactions with the customer, GE erroneously blamed CRM for having made undisclosed modifications to a software utility developed by CRM, and claimed that this must have caused the malfunction experienced by the customer.

167. Upon learning of GE's claim, CRM promptly investigated and discovered the claim to be wrong; and CRM so informed the customer and GE.

168. CRM went further by directing its own engineers to invest substantial time, without compensation, in order to ascertain the underlying source of the malfunction. Ultimately, CRM identified an undisclosed modification *made by GE*, in which one or more extra bits of data were added to GE's locomotive control system software unbeknownst to CRM.

169. Once revealed, GE's engineers admitted to the customer that the malfunction had been caused by GE's undisclosed software change, rather than anything done by CRM. As a result of CRM's efforts, the locomotive sale proceeded thereby allowing GE to receive millions or tens of millions of dollars in sales revenue.

170. GE's failure to notify CRM of the technical modification to GE's software constituted a distinct breach of its express and implied duties to provide all technical information necessary to allow continued GEER functioning and to refrain from misinforming the customer about alleged

- 40 -

CRM or GEER performance in order to deflect blame away from GE.

171. GE's breach involving the undisclosed software modification caused CRM commercial injury by forcing CRM's engineers to expend substantial uncompensated time to investigate and identify the malfunction caused by GE, and then engage with GE and the Canadian Customer to ensure the problem was accurately diagnosed and resolved. Otherwise, CRM faced a material risk of being wrongly blamed once again for GE's nonperformance.

172. Yet another such episode unfolded with a third customer based in Kansas City (the "KC Customer"), in which GE made undisclosed modifications to its message interface that caused a CRM-developed playback utility to stop functioning.

173. What was worse, GE refused repeated requests from both the customer and CRM to furnish the updated message interface to CRM, even after CRM pointed to GE's obligations under the Supply Agreement to provide all technical information and interfaces needed to support GEER functioning. Consequently, the KC Customer still lacks the ability to use CRM's GEER playback utility, even though the customer has stated a clear preference to use CRM's playback utility rather than an alternative utility developed by GE or its affiliates.

174. GE's breach of its duties alleged in this cause of action, including its ongoing refusal to provide CRM with all technical information and interfaces necessary to allow for GEER functioning, threatens to irreparably harm CRM by restraining the market for CRM's event recorders, playback utility, and related products or services.

175. Upon information and belief, GE selectively licenses its technical information and interfaces to advantage competitors of CRM, including affiliates of GE. GE's breaches of the Supply Agreement as alleged herein, in conjunction with its selective licensing of its locomotive,

7314654.5

playback, and other interfaces in general, is limiting competition in the market for event recorders. In particular, GE's refusal to provide CRM with necessary technical information and interfaces, as required under the Supply Agreement, makes CRM's products and services less competitive to the extent that all suppliers require GE's technical information and interfaces for access to GE's locomotives. GE's selective licensing practices likewise harm rail customers by depriving them of free choice to select those products and services that they expressly prefer, as with the KC Customer.

176.  In effect, GE is using its contract with CRM and its position as the dominant North American supplier of locomotives to interfere with free competition in the downstream market for rail components to the detriment of CRM as well as rail customers.

WHEREFORE, CRM respectfully requests the following relief:

A. Dismissal of Plaintiff GE's Complaint with prejudice.

B. On Defendant and Counterclaimant CRM's First Cause of Action, an award of special damages in an amount to be proven at trial, but estimated at no less than $12.5 million less CRM's expenses;

C. On Defendant and Counterclaimant CRM's Second Cause of Action, an award of consequential and other compensatory damages; lost profits; interest; costs; and attorneys' fees;

D. On Defendant and Counterclaimant CRM's Third Cause of Action, an award of damages; a declaration of the parties' respective rights and obligations under the Supply Agreement; and *either* specific performance of GE's duty to provide complete technical information and interfaces needed for GEER functioning *or* partial or complete rescission of the Supply

7314654.5

Agreement or an equivalent finding of unenforceability so as to free CRM from contractual

restrictions on CRM's ability to compete in the event recorder market;

E.  Trial by jury for all issues so triable; and

F.  Such other and further relief as the Court deems just and proper.

\*        \*        \*        \*

## JURY TRIAL DEMAND

CRM demands a jury trial on all issues raised in its counterclaims that are triable by a

jury.

Date: August 3, 2020                             ZUCKERMAN SPAEDER LLP

By:   _/s/ Daniel P. Moylan_____
      Daniel P. Moylan (*pro hac vice*)
      100 East Pratt Street, Suite 2440
      Baltimore, MD 21202-1031
      Tel: 410-332-0444
      Fax: 410-659-0436
      dmoylan@zuckerman.com

      – and –

      Adam L. Fotiades (*pro hac vice*)
      1800 M Street NW, Suite 1000
      Washington, DC 20036-5807
      Tel: 202-778-1800
      Fax: 202-822-8106
      afotiades@zuckerman.com

      *Counsel for Defendant*
      *Central Railway Manufacturing, LLC*

7314654.5