UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/4/2021

GE Transportation Parts, LLC,

        Plaintiff,

–v–

Central Railway Manufacturing, LLC,

        Defendant.

19-cv-4826 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

    Two manufacturers of train components dispute who derailed their relationship with a customer. GE Transportation Parts, LLC, sued Central Railway Manufacturing, LLC, alleging that Central's event recorders were faulty. Central claims that GE's digital recording products were the problem and that GE wrongly blamed Central's event recorders in discussions with the customer. GE moves to dismiss Central's three counterclaims. For the reasons that follow, the Court concludes that Central plausibly alleges a claim for breach of contract but that its other counterclaims must be dismissed.

**I.    Background**

    For purposes of this motion, the Court takes as true all factual allegations in Central's amended counterclaim, Dkt. No. 76, and draws all reasonable inferences in its favor.

    GE and Central each manufacture train components. Amended Counterclaim ("AC") ¶ 7. The two entered into a supply agreement in late 2015, under which Central agreed that GE would be the sole channel to end customers for certain train components. AC ¶ 9, Supply Agreement ("SA") § 2(a). In return, GE agreed to source components from Central. SA § 2(c). The supply

agreement included provisions allowing Central to sell components to end customers subject to certain licensing terms. *Id.* § 2(b). It also included a provision requiring the parties to use commercially reasonable efforts to bolster consumer confidence in the products. *Id.* § 2(i).

Until December 2018, GE sold its LocoVISION camera systems bundled with event recorders manufactured by Central to a U.S. customer. AC ¶¶ 6–7, 47. Under its contract with the customer, GE agreed to provide event recorders capable of recording three types of data in crash-hardened memory: (1) positive-train-control data, (2) locomotive data, and (3) video data recorded by a camera system such as LocoVISION. *Id.* ¶ 11.

The customer began complaining that the event recorders were not properly recording video data from the LocoVISION camera systems. In Central's telling, its event recorders were not the problem. *Id.* ¶ 14. GE and Central participated in tests throughout 2016 and 2017, which confirmed that the event recorders were capable of recording all three types of data. *Id.* ¶¶ 12–13. Instead, the customer's problems resulted from defects in the LocoVISION camera system and the configuration of the customer's local area network on its trains. *Id.* ¶¶ 16–21.

Following the customer's complaints, Central furnished a design document to GE proposing a solution it believed would allow data from the LocoVISION camera system to properly flow to the event recorders over the customer's local area networks. *Id.* ¶¶ 22–25. However, GE took no action on Central's proposal. *Id.* ¶ 26. It instead suggested other approaches but never provided Central with the technical information to follow them. *Id.* ¶ 27. The customer served a notice of default on GE in June 2018. *Id.* ¶ 36.

Central continued to press GE for approval to implement the network solution it had developed or to communicate directly with the customer about other options. *Id.* ¶¶ 40–45. GE

ignored those requests. *Id.* ¶ 46. In December 2018, the customer terminated its contract with GE. *Id.* ¶ 47.

The customer cited defects in the LocoVISION system as the basis for terminating its contract. *See* Termination Notice, Dkt. No. 25-6. The customer demanded GE assist it in removing LocoVISION equipment from its trains, but proposed to keep the event recorders and integrate them into a replacement system. *Id.*; AC ¶ 53. Between December 2018 and February 2019, GE negotiated with the customer regarding the contract termination without Central's knowledge. AC ¶ 56. During those negotiations, GE blamed Central for the failure of its LovoVISION systems, falsely asserting that the event recorders were incapable of three-in-one recording and that Central had refused to develop a solution to the customer's problems. *Id.* ¶¶ 55, 59–62. As a result, the customer returned the event recorders rather than integrating them into a new system as it had proposed in its termination notice. *Id.* ¶¶ 53, 56, 63.

GE's negotiations with the customer culminated in a settlement agreement signed in February 2019, in which GE and the customer released all claims between them. *Id.* ¶ 61. GE then sued Central seeking damages for breach of the supply agreement and indemnification for its payment to the customer under the settlement agreement. Dkt. No. 1. Central asserts counterclaims for product disparagement, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and breach of contract. AC ¶¶ 124–76.

**II.     Legal Standard**

"Federal Rule of Civil Procedure 12(b) applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Gerdau Ameristeel US Inc. v. Ameron Int'l Corp.*, No. 13-cv-07169 (LGS), 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014). "To survive a motion to dismiss, a

complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When determining whether a pleading states a claim, a court accepts its allegations as true and draws all reasonable inferences in favor of the non-moving party.  *Id.*  A party may raise the affirmative defense that a claim is time-barred in a motion to dismiss if that defense appears on the face of the pleading.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989).

"A federal court sitting in a diversity case will apply the substantive law of the forum state on outcome determinative issues." *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997).  When a state's highest court has not authoritatively decided an issue, the Court must apply the law as interpreted by its intermediate appellate courts absent "persuasive evidence" that its highest court would reach a different conclusion. *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003) (quoting *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)).  Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

**III.   Discussion**

    **A.   Central's Product Disparagement Claim is Untimely**

New York follows the traditional rule that statutes of limitations are procedural, and thus its own statute of limitations generally applies even where another state's substantive law governs.  *Stafford v. Int'l Harvester Co.*, 668 F.2d 142, 147–48 (2d Cir. 1981); *Martin v. Julius Diereck Equip. Co.*, 374 N.E.2d 97, 99 (N.Y. 1978).  The State's borrowing statute provides a

limited exception to this rule: if an out-of-state plaintiff asserts a cause of action that accrued outside the State, New York courts apply whichever statute of limitations is shorter. *Martin*, 374 N.E.2d at 99; *see* N.Y. C.P.L.R. § 202. The parties agree that Central's product disparagement claim accrued in Florida. Thus, its claim may proceed only if timely under both the New York and Florida statutes of limitations. The Court concludes that the claim is untimely under New York's statute of limitations.

Claims for product disparagement are subject to a one-year statute of limitations under New York law. *Thome v. Alexander & Louisa Calder Found.*, 890 N.Y.S.2d 16, 29 (App. Div. 2009) (citing N.Y. C.P.L.R. § 215(3)). Central does not dispute that GE made the allegedly false statements no later than February 2019 and that it did not file its counterclaim until June 2020. *See* AC ¶ 59–61; Dkt. No. 50. Its claim is therefore time-barred if it accrued at the date the false statements were made. The parties dispute whether a claim for product disparagement accrues when the allegedly false statements are made or when the plaintiff suffers special damages.

New York law provides no clear answer to the claim-accrual question. The Appellate Division has described product disparagement as "a species of defamation and slander of title." *Thome*, 890 N.Y.S.2d at 29. Claims for defamation accrue upon publication of a defamatory statement. *Nussenzweig v. diCorcia*, 878 N.E.2d 589, 590 (N.Y. 2007). Claims for slander of title, on the other hand, accrue only once the plaintiff incurs pecuniary loss. *Rosenbaum v. City of New York*, 861 N.E.2d 43, 49 (N.Y. 2006).

Product disparagement traces its lineage most closely to slander of title. *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 521 (N.Y. 1981). Courts gradually extended that cause of action to cover more methods of disparagement, more types of property, and finally disparagement of the quality of a product rather than only its good title. *Id.* at 521–22. Past its

5

history, product disparagement also shares a conceptual feature with slander of title: unlike defamation (at least in its historical form), product disparagement requires proof of special damages. *Id.* But there is an important practical difference, too. While a falsely recorded easement might go unnoticed for years, the same is unlikely to be true for statements denigrating the quality of a seller's products. *See Rosenbaum*, 861 N.E.2d at 49.

The Court is not aware of any decision authoritatively settling this question. A number of courts have assumed, without discussion, that claims for product disparagement accrue on the date of publication. *See, e.g.*, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 276 (S.D.N.Y. 2016); *Navarra v. Marlborough Gallery, Inc.*, No. 10-cv-7547 (BSJ) (RLE), 2012 WL 13210272, at *7 (S.D.N.Y. Apr. 4, 2012); *Gen. Sec., Inc. v. APX Alarm Sec. Sols., Inc.*, 647 F. Supp. 2d 207, 218 (N.D.N.Y. 2009). In one case, the Appellate Division nodded toward both possibilities with an "even if" but declined to decide between them. *See Thome*, 890 N.Y.S.2d at 29.

Were it put to the choice, the Court would follow those that have assumed a product disparagement claim accrues when the disparaging statement is made. In its modern form, product disparagement more closely resembles defamation than slander of title, and New York courts have applied the single-publication rule to other modern torts in this ilk. *See, e.g.*, *Nussenzweig*, 878 N.E.2d at 590 (privacy torts). Like in *Thome*, however, the Court need not decide this question. Under either theory of claim accrual, the allegations in the amended counterclaim reflect that the cause of action accrued no later than February 2019.

Taking as true the allegations and drawing reasonable inferences in Central's favor, GE made the disparaging statements to the customer about Central's event recorders and willingness to implement proposed solutions during the settlement negotiations that took place between

6

December 2018 and February 2019. *See* AC ¶¶ 55–61. In February 2019, in reliance on those disparaging statements, the customer entered into the settlement agreement with GE under which the customer agreed that it would return the event recorders. *Id.* ¶¶ 63–64. GE's disparaging statements to the customer deprived Central of the opportunity to attempt to salvage its business arrangement with the customer. *Id.* ¶ 65. GE's demand for indemnification included costs associated with GE's repurchase of the event recorders. *Id.* ¶ 69. Central did not assert its counterclaims until June 2020—more than a year after the disparaging statements, the customer's decision to return the event recorders, and GE's demand for indemnification.

Central contends that although GE and the customer finalized the settlement agreement in February 2019, it did not suffer losses until late 2019 when the customer would have purchased additional event recorders. Opp. Br., Dkt. No. 86, at 3–4. The allegations in the amended counterclaim belie this contention. Central alleges that, because of GE's disparaging statements, the customer agreed in the February settlement agreement to return event recorders that it otherwise would have kept, subjecting Central to an indemnification claim for the cost of their repurchase. AC ¶¶ 53, 63–65, 69. Moreover, Central alleges that it had lost any opportunity to salvage its relationship with the customer by the time of the settlement agreement. *See* AC ¶ 65. Thus, its loss of further business became certain at that time, not when additional event recorders would have been delivered or paid for. Central therefore suffered damages—including the loss of past sales and the loss of expected future profits—by the time of the settlement agreement.

Based on these allegations, and drawing all reasonable inferences in Central's favor, the Court concludes that both GE's disparaging statements and Central's losses occurred more than a year before it filed its counterclaims. Its counterclaim for product disparagement is therefore untimely regardless of the correct standard for claim accrual.

### B. FDUTPA Does Not Permit Claims for Lost Profits

"FDUTPA is a consumer-protection statute designed to 'protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916, at *4 (S.D. Fla. May 16, 2016) (quoting Fla. Stat. § 501.202(2)). The statute permits damages claims by both consumers and competitors. *Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. Dist. Ct. App. 2016). A FDUTPA damages claim has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008) (quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. Dist. Ct. App. 2006)).

FDUTPA allows recovery only of "actual damages." *Smith v. 2001 S. Dixie Highway, Inc.*, 872 So. 2d 992, 994 (Fla. Dist. Ct. App. 2004) (quoting Fla. Stat. § 501.211(2)). "In the context of FDUTPA, 'actual damages' have been defined as 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Id.* (some internal quotation marks omitted) (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)). Florida courts have consistently held that FDUTPA does not allow recovery of consequential damages, including lost profits. *See, e.g.*, *id.* ("Actual damages, as pertaining to FDUTPA, does not include 'actual consequential' damages."); *City First Mortg.*, 988 So. 2d at 86 ("FDUTPA[] . . . provides for recovery only of 'actual damages,' which cannot include consequential or special damages."); *Orkin Exterminating Co. v. DelGuidice*, 790 So. 2d 1158, 1162 (Fla. Dist. Ct. App. 2001) ("Actual damages, as interpreted by the first district in

8

*Urling* and followed by at least two other courts interpreting Florida law, does not include 'actual consequential' damages."); *Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So. 2d 311, 314 (Fla. Dist. Ct. App. 1998) ("[T]he Act only allows recovery of damages related to the property which was the subject of the consumer transaction."); *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451, 454 (Fla. Dist. Ct. App. 1985) ("[S]pecial or consequential damages . . . fall outside the statutory concept of actual damages as defined in section 501.211.").

Central contends that since the 2001 amendments to FDUTPA, which broadened FDUTPAs remedial provisions to allow suits for damages by competitors, the availability of damages for lost profits is an open question. The Court disagrees. After 2001, Florida appellate courts have continued to reiterate that actual damages under FDUTPA do not include consequential damages. *See, e.g.*, *City First Mortg.*, 988 So. 2d at 86; *Smith*, 872 So. 2d at 994. The Court must follow those decisions absent "persuasive evidence" that the Florida Supreme Court would decide the matter differently. *Blue Cross & Blue Shield of New Jersey*, 344 F.3d at 221. In a recent opinion, Judge Furman thoroughly considered similar arguments and concluded that "Florida law . . . clearly weighs against the inclusion of lost profits in FDUTPA actual damages." *Apotex Corp. v. Hospira Healthcare India Private Ltd.*, No. 18-cv-4903 (JMF), 2019 WL 3802096, at *2 (S.D.N.Y. Aug. 13, 2019). The Second Circuit affirmed that decision on the same grounds. 827 F. App'x 149 (2d Cir. 2020). The Court agrees with Judge Furman's analysis and concludes that lost profits are unavailable in a FDUTPA claim.

Central pleads no damages other than lost profits in its FDUTPA claim, and its factual allegations suggest no actual damages under the standard set out by the Florida District Court of Appeal in *Smith*, 872 So. 2d at 994. *See* AC ¶ 156. Central has therefore failed to plausibly

9

allege actual damages and so fails to state a claim under FDUTPA. *See id.*; *City First Mortg.*, 988 So. 2d at 86.

    **C.**    **Central States a Claim for Breach of Contract**

Central alleges that GE breached § 2(b), (i), and Exhibit C of the supply agreement and the implied covenant of good faith and fair dealing. AC ¶¶ 159–61. Subsection 2(b) of the supply agreement sets forth the standards for Central's sale of components to end customers, including requiring that "GE will provide specifications and oversight to verify and validate (V&V) the GE Specified Components for certification." Subsection 2(i) is a covenant to protect customer confidence in the products. It states: "GE and [Central] will use commercially reasonable efforts to bolster GE Specified Component customer confidence with GE regarding any warrantying and servicing of the GE Specified Components." Exhibit C is a trademark license agreement governing Central's sale of GE-branded products. It grants Central a license to use GE's proprietary technical information to produce branded products.

Central alleges breaches of these provisions in two general categories: (1) misinforming customers about the Central's products and its willingness to implement customer solutions and (2) withholding technical information Central needed to resolve customer issues. AC ¶ 161. Central also alleges that this conduct violated the implied covenant of good faith and fair dealing because it was designed to frustrate Central's expectations under the supply agreement. *Id.* ¶¶ 159–60, 163.

GE contends that none of the contractual provisions Central cites impose any obligation on GE. In its view, § 2(i) requires GE and Central to use commercially reasonable efforts to bolster "customer confidence *with GE*," and so inures only to GE's benefit. Opening Br. at 22 (alteration omitted) (quoting SA § 2(i)). Subsection 2(b) and Exhibit C, GE argues, only

"establish[] certain ground rules for potential future licensing agreements" and impose no obligations on the parties until such future licensing agreements may be executed. *Id.* at 23. GE does not address the claim that it violated the covenant of good faith and fair dealing. *See id.* at 21–25; Reply Br., Dkt. No. 89, at 9–10.

      The Court rejects GE's proposed reading of § 2(i) and concludes that Central has plausibly alleged a violation of that provision. The parties were careful to specify in § 2(a)-(o) those obligations that apply to GE alone, to Central alone, or to both. Subsection 2(i) states that "*GE and* [*Central*] will use commercially reasonable efforts" (emphasis added). The most natural reading of this provision is that it imposes an obligation on both parties. The Court is also not persuaded that, because it requires the parties to use reasonable efforts to bolster "GE Specified Component customer confidence with GE," the benefits of the provision were intended to inure solely to GE's benefit. Under the structure of the agreement, GE was to be the sole channel to market for components manufactured by Central. *See id.* § 2(a). Thus, customer confidence in GE—the party responsible for direct sales to end customers—plainly affects both parties. Nothing in the agreement's text or structure suggests that when the parties wrote "GE and [Central] will," they intended to impose that obligation on Central alone. GE does not dispute that falsely maligning the event recorders or refusing to work with Central on a solution to the customer's concerns may reflect less than commercially reasonable efforts to bolster customer confidence in its products. The Court concludes that, accepting Central's allegations and drawing reasonable inferences in its favor, Central has plausibly alleged a breach of this provision.

      The Court reaches the same conclusion for § 2(b) and Exhibit C of the agreement. GE contends that these provisions only set the ground rules for Central's sale of components to end

11

customers in the event that GE later agreed to such sales.  However, it points to no specific language in the agreement supporting that interpretation.  Subsection 2(b) begins with the statement that "[Central] may sell GE Components . . . under the following conditions" and then sets out terms including an already agreed-upon licensing-fee structure.  GE's consent to specific sales in some future agreement is not among those terms.  Subsection 2(b) leaves one smaller point to future negotiations: "GE branded GE Specified Components[] . . . will be branded under the terms of a branding strategy to be mutually agreed to in writing by the Parties . . . ."  But it states unequivocally that "GE will provide specifications" for certification of components that Central wishes to sell to end customers.

Nothing in § 2(b) or Exhibit C suggests that negotiation of some separate, future licensing deal is a condition precedent to GE's obligation to provide product specifications and technical information.  Given that the supply agreement otherwise prohibits Central from direct customer sales, this sort of condition would have serious ramifications for the parties, and the Court expects that it would be stated clearly.  Nor can the Court say, as a matter of law, that the technical information Central alleges GE refused to provide is not of a type required to be provided under § 2(b) and Exhibit C.  The Court concludes that, accepting Central's allegations and drawing reasonable inferences in its favor, Central has plausibly alleged a breach of these provisions.

### D. Further Leave to Amend is Unwarranted

Under this Court's individual rules, parties have an opportunity following a motion to dismiss to amend their pleading to cure any defects made apparent by the motion or to rest on their existing pleadings and oppose the motion.  Central acknowledged this rule and informed the Court that it would rely on its amended counterclaims rather than seek further leave to amend

following GE's motion to dismiss. *See* Dkt. No. 82. Central does not request further leave to amend. It has therefore waived any right to further amendment to correct defects made apparent by the motion to dismiss. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC.*, 797 F.3d 160, 190 (2d Cir. 2015) (leaving "unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility"). The Court will therefore dismiss the product disparagement and FDUTPA counterclaims with prejudice.

## Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part GE's motion to dismiss Central's amended counterclaims (Dkt No. 78).[1] The Court dismisses Central's product disparagement and FDUTPA counterclaims with prejudice. The Court declines to dismiss Central's counterclaim for breach of contract. The discovery schedule set forth in the Court's Order of February 12, 2021 (Dkt. No. 92), remains in effect.

This resolves Docket Numbers 78 and 64.

SO ORDERED.

Dated: March 4, 2021
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

---

[1] GE's prior motion to dismiss Central's counterclaims (Dkt. No. 64) is DENIED as moot.